## SKEELES v. UNITED STATES
(two cases).

Nos. 48838, 48839.

United States Court of Claims.

Feb. 6, 1951.

Robert A. Littleton, Washington, D. C., for plaintiff.

H. S. Fessenden, Washington, D. C., Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Washington, D. C., on the brief, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

These cases involve gambling losses. In reporting income may such losses be carried forward from a previous year as a deduction for the current year on the ground that gambling was the taxpayer's business, and that the deduction should be allowed as a business loss?

Gambling is apparently as old as the human race. The practice runs back through recorded history until it is lost amid the mysteries of tradition. It affects people in all latitudes, longitudes and stages of civilization. The ancient and

oriental and medieval European as well as the modern American have in time come under its influence. Greece and Rome came under its spell, and an ancient Hindu hymn bewails the woes of the ruined gambler.

It has been practiced in every stage of society, whether primitive or complex. It has followed largely five distinct patterns:

Wagers on the outcome of races between humans, animals, or machines; physical contests such as fighting between human beings, animals, or birds; games of skill such as checkers, chess, football, basketball, and numerous popular games; contests of pure intellectual skill; and wagers based on pure chance, such as lotteries or the tossing of a coin.

The Australian and South African Bushmen had competitions for prizes, as have all other known peoples. Sometimes the stakes were large. Tacitus, whose penetrating brevity makes his history fascinating reading, tells of wealthy Romans who bet so heavily on chariot races that they lost their entire fortunes and as a consequence their respectability. He says that in some instances in his time men gambled away their liberty.

In practically all countries a distinction has been made both in the public mind and in legislative enactment between the occasional wagerer and the professional who undertakes, without work, to wring a living from the wages of others. The professional or common gambler has never occupied a high position in society. In the old cow country there were a few men who by the skillful use of the branding iron reached the dizzy heights of a cattle king, but these men never stood high with the great run of cattlemen who depended for their success on their knowledge of the cattle business, their ranching experience and their skill in buying and selling.

The churches generally have opposed gambling as immoral. The Talmud classes gambling winnings with thievery.

There is a long record of legislation against gambling in many, in fact in most countries, sometimes on moral but more often on economic grounds.

Anti-gambling legislation runs into many practical difficulties. Small wagers seem inconsequential while the profits of big-time, highly organized gambling are so great that sometimes public officials are bribed, and the element of chance taking deteriorates into weapon-controlled racketeering, which is crime in its lowest form. In the United States this difficulty is further complicated by the fact that the 48 states have passed varying laws.

Another complicating factor has been the desire to encourage games of skill. Games of pure chance like faro, roulette, and dice have been made illegal almost universally, while games of skill have sometimes been encouraged or permitted. In interpreting legislation that undertook to make this distinction the decisions have been conflicting and the record is full of reversals and contradictions. The general pattern seems to be that when skill predominates the gaming is lawful and when chance is the major element it is illegal.

There is an element of chance in all the affairs of life even in the soundest and most conservative of business undertakings. This element of chance is sometimes referred to as luck. It is sometimes difficult to find where business judgment leaves off and chance or luck begins. For example, when Charles Lindbergh flew to Paris in a small plane he had to have considerable luck, but as in all such undertakings luck needs a partner, and in that instance the partner was the unusual skill, experience and daring of the flyer. If he had depended on blind chance alone he probably would have fallen into the ocean.

Wagering has had a strange hold on the human race. The barefoot boy plays marbles for keeps, throws knives with a cry of "whole blade or no trade," and in the prairie states will wager whatever is in his pocket on which dog will catch the mule-eared rabbit. Grown men and women continue the practice in a multitude of forms. But through it all the professional gambler has been more or less condemned. Perhaps the distinction is in recognition of the injunction when man was taken out of Eden that he should "eat his bread in the sweat of his face."

244

The betting instinct is so strong in so many people that in the field of legislation so many problems of enforcement have arisen as to cause a movement to legalize gambling and have it state controlled. Betting on horse racing has been so popular in English-speaking countries that legislation in many instances was ineffective. Eventually it became legalized in many places under what is known as the pari-mutuel system. But usually the legalized wagering has been limited to the area of the track.

The network of wires and radio carrying information of race results, lotteries in many forms, pools on the result of athletic contests, slot machines and numerous other devices evidence the widespread interest in wagering and indicate some of the difficulties of enforcing laws.

Licensing, supervising, inspection, and many methods have been tried not because of approval, but in an effort to minimize its evils and in so far as possible to reduce the trickery and deception that are sometimes used to trap the unwary.

In this long-time effort to legislate in reference to gambling, which has prevailed in practically all countries, about the only consistent defenders of the practice have been the gamblers themselves. At the same time, practical men have recognized the desirability of some form of control.

In most states gambling debts are not collectible in the courts. In some few states a gambling debt is collectible, even though the gambling itself is illegal.

This background is given as an aid to the interpretation of the statute. For the occasional wagerer no carry-over deduction is allowed. To sustain the contention of plaintiff it is necessary to extend to the professional gambler tax-deduction privileges that are not accorded to one who bets occasionally. To reach such a conclusion in the face of the public viewpoint and legislative purposes generally would require a clearly worded statute that precludes any other reasonable conclusion.

Plaintiff's deceased husband was a professional gambler. He bet on horse races, football and baseball games, prize fights, and card and dice games. His gambling and wagering transactions, conducted for his own account and with others, constituted his and his wife's only source of income in 1940, 1941, and 1942. All his transactions, which were in violation of city and state laws, were entered into for profit.

Plaintiff and her husband regularly filed separate returns of community income. In 1940 there was a community net loss of $12,200.69; in 1941 a community net income of $83,674.29; and in 1942 a community net loss of $66,570.98. In their 1941 returns plaintiff and her husband each sought to take a net operating loss deduction, carrying over the 1940 loss; the Commissioner of Internal Revenue disallowed the deductions and assessed deficiencies for 1941 which were paid. Plaintiff's later claims for refunds of 1941 taxes on account of the 1940 loss have not been acted on by the Commissioner. Plaintiff and her husband also each sought a refund of a portion of the 1941 taxes on the ground that the 1942 net operating loss could be carried back to 1941 as a deduction. These claims were rejected. In No. 48838 plaintiff, as administratrix of the estate of her husband, seeks a refund of tax overpaid by him for 1941; in No. 48839 she seeks a refund of tax overpaid by herself for that year.

Section 23(s) of the Internal Revenue Code, 26 U.S.C.A. § 23(s), permits as a deduction from gross income the net operating loss deduction computed under Section 122. Section 122 defines "net operating loss" as the excess of the deductions allowed by Chapter I of the Code over the gross income, computed with certain exceptions and limitations. It prescibes the formula for carrying such losses over to the taxable year from prior years and back to the taxable year from later years. The deductions allowed by Chapter I which are pertinent here are those set out in Section 23(e) and (h):

"§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions:

*    *    *    *    *    *

"(e) Losses by individuals. In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—

"(1) if incurred in trade or business; or

"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or

\* \* \* \* \* \*

"(h) Wagering losses. Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions."

▮ The amounts of $12,200.69 and $66,570.98 represent the excess of William E. Skeeles' gambling losses over his gambling gains in 1940 and 1942 respectively. The issue is whether these amounts are deductible, as plaintiff contends, under Section 23(e). We hold that they are not.

Section 23(h) of the Internal Revenue Code first appeared as Section 23(g) of the Revenue Act of 1934. 48 Stat. 680, 689. Under prior law the Board of Tax Appeals had decided that gains from illegal wagering constituted income only to the extent that they exceeded wagering losses. Appeal of James P. McKenna, 1 B.T.A. 326. Cf. Anderson v. Commissioner of Internal Revenue, 35 B.T.A. 10, holding that losses from illegal gambling were not deductible at all, not even to the extent of gains from legal gambling. Wagering losses in excess of wagering gains could not be deducted if the transactions were illegal, Simms v. Commissioner of Internal Revenue, 28 B.T.A. 988; Appeal of Mitchell M. Frey, Jr., 1 B.T.A. 338; Appeal of James P. McKenna, supra; or, even if legal, if taxpayer failed to show that they were entered into for profit, Citizens & Southern National Bank v. United States, 14 F.Supp. 915, 83 Ct.Cl. 618; Beaumont v. Helvering, 63 App. D.C. 387, 73 F.2d 110, certiorari denied 294 U.S. 715, 55 S.Ct. 512, 79 L.Ed. 1248. Conversely, wagering losses *were* deductible,

under a statutory provision similar to present Code Section 23(e) (2), if they resulted from legal transactions entered into for profit. Cronan v. Commissioner of Internal Revenue, 33 B.T.A. 668; G.C.M. 10873, XI–2 C.B. 85 (1932); S.M. 2680, III–2 C.B. 110 (1924); I.T. 1865, II–2 C.B. 125 (1923). No case has been called to the court's attention, under present or prior law, in which a taxpayer claimed that wagering was his business and that his wagering losses were consequently deductible as business losses under provisions similar to present Code Section 23(e) (1).

Plaintiff suggests that Skeeles' losses would have been deductible under prior law since those who won from him had legally enforceable claims against him under Article 2983 of the Louisiana Civil Code.[1] The applicability of Article 2983 to the losses of a professional gambler whose activities were illegal has not been shown. However, even if it did give all winners from Skeeles causes of action against him, his activities were still unlawful, a fact which in itself would presumably prevent his losses in excess of his gains from being deducted under Section 23(e) (2).

Plaintiff, however, does not claim that the losses in excess of gains are deductible under Section 23(e) (2) but rather that they are deductible as business losses under Section 23(e) (1). If illegality prevents a taxpayer from deducting a net loss under Section 23(e) (2), it is hard to see why it would not also prevent his deducting a net loss under Section 23(e) (1). Defendant contends that all gambling losses, whether or not gambling was the taxpayer's business, are governed by Section 23(h) and that therefore the deductions which plaintiff claims, being gambling losses in excess of gambling gains, were properly disallowed. The question, it appears, has not been expressly ruled on before.

1. Article 2983 reads as follows: "The law grants no action for the payment of what has been won at gaming or by a bet, except for games tending to promote skill in the use of arms, such as the exercise of the gun and foot, horse and chariot racing.

"And as to such games, the judge may reject the demand, when the sum appears to him excessive."

█ In Jennings v. Commissioner of Internal Revenue, 110 F.2d 945, the Circuit Court of Appeals, Fifth Circuit, held that a member of a gambling partnership, whose losses from his individual gambling operations were less than his share of the partnership's net gambling gains, could offset his individual gambling losses against his share of the partnership's net gains. Although gambling was not the individual taxpayer's only source of income, it was, apparently, the partnership's only activity. However, the court did not discuss any Code section other than 23(h) nor does it appear that any other section was urged upon it. In Humphrey v. Commissioner of Internal Revenue, 162 F.2d 853, the same court reversed a Tax Court decision that a taxpayer whose wagering losses did not exceed his wagering gains could not deduct such losses without showing that the losing wagers were transactions entered into for profit. Said the court, 162 F.2d at page 855:

"It is argued [by the Government] that Par. (h), Wagering Losses, is only a gloss on or an addition to Par. (e), and that (e) still governs such losses. We do not think so. If that had been the intent of Congress the matter of (h) would simply have been placed in (e). Instead the deductions (f) and (g) intervene, and are independent of (e); as is (h) which follows them. Each lettered paragraph authorizes a class of deductions. Wagering losses are made a class to themselves and "shall be allowed as deductions", but "only to the extent of gains from such transactions." No longer need it be enquired whether the wagers were illegal so that the loss need not have been paid; nor what the state of mind of the taxpayer was as respects his purpose to win a profit. All wagers are by Par. (h) gathered into a class of their own and dealt with as the paragraph states."

This statement, it is submitted, correctly interprets Section 23(h) to mean exactly what it says. It also goes a long way towards resolving the conflict which arises between Section 23(h) and Section 23(e) (1), each unambiguous standing alone, in the case of losses which are both business losses and wagering losses. That is the situation presented if Skeeles' activities, although illegal, should be regarded as constituting a business within the meaning of the Internal Revenue Code.

The Legislative history of present Code Section 23(h) reveals no express statement resolving this conflict. The Committee Reports on the Revenue Act of 1934 did not discuss whether the new section was to apply to a taxpayer whose business was gambling. They stated that the principal purpose of the new section was to limit the deduction for losses from legalized gambling in the same manner as losses from illegal gambling were already limited.[2] In hearings before the Senate Committee on Finance, Dr. Roswell Magill, Assistant to the Secretary of the Treasury, stated in response to a question that the Treasury had not found it necessary to consider whether gambling was the taxpayer's business, "because he could get the deduction as a loss, if the transaction was entered into for profit, in the event that the transaction was legal." Hearings before the Committee on Finance, United States Senate, Seventy-Third Congress, Second Session, on H.R. 7835, Part I, March 6, 1934, Unrevised [originally Confidential], page 33. Dr. Magill's statement appears to have been the only reference made in the course of the

---

2. From the Report of the House Committee on Ways and Means: "Section 23(g). Wagering Losses: Existing law does not limit the deduction of losses from gambling transactions where such transactions are legal. Under the interpretation of the courts, illegal gambling losses can only be taken to the extent of the gains from such transactions. A similar limitation on losses from legalized gambling is provided for in the bill. Under the present law many taxpayers take deductions for gambling losses but fail to report gambling gains. This limitation will force taxpayers to report their gambling gains if they desire to deduct their gambling losses." House Report 704, 73d Congress, 2d Session, page 22. This was also the language of the Report of the Senate Committee on Finance. Senate Report 558, 73d Congress, 2d Session, page 25.

legislative process to the effect of the section on a taxpayer in the business of gambling. Taken in context, his statement was intended as descriptive of existing law, that is, the law before the Revenue Act of 1934. It certainly is not persuasive evidence that Congress intended that the new section should not apply to a taxpayer whose business was gambling. (Indeed, Judge Holmes, dissenting in the Humphrey case, relied on Dr. Magill's statement to bolster his contention that Section 23 (h) was intended merely as an additional restriction upon the deductibility of gambling losses so that they could thenceforth be deducted only to the extent of gambling gains and then only if they were sustained in legal transactions entered into for profit.) We feel that the quotation from the opinion of the majority in the Humphrey case, supra, correctly states the law.

This is also the result reached by application of the customary rules of statutory construction. Section 23 (e)(1) provides for business losses generally, but Section 23 (h) provides for wagering losses specifically. In such cases the specific statutory provision limits the general. Clifford F. MacEvoy Co. v. United States, 322 U.S. 102, 64 S.Ct. 890, 88 L.Ed. 1163; D. Ginsberg & Sons, Inc., v. Popkin, 285 U.S. 204, 52 S.Ct. 322, 76 L.Ed. 704; Rodgers v. United States, 185 U.S. 83, 22 S.Ct. 582, 46 L.Ed. 816; Townsend v. Little, 109 U.S. 504, 3 S.Ct. 357, 27 L.Ed. 1012. Also, where the language of two provisions of the same statute gives rise to a doubt, the doubt will be resolved in favor of the later expression. Reynolds v. United States, 95 Ct.Cl. 160.

Section 23 (h), not Section 23 (e), is the applicable statutory provision. The amounts claimed as deductions, being gambling losses in excess of gambling gains, were, therefore, properly disallowed. The petitions in both cases are dismissed.

HOWELL, MADDEN, and WHITAKER, Judges, concur.

LITTLETON, Judge, took no part in the decision of this case.