George **WINKLER**, Defendant, Appellant,

v.

**UNITED STATES** of America, Appellee.

**No. 5026.**

United States Court of Appeals First Circuit.

March 8, 1956.

Woodbury, Circuit Judge, dissented. See also, 17 F.R.D. 213.

Walter F. Gibbons and Irving Brodsky, Providence, R. I., with whom Francis J. Kiernan and James F. Armstrong, Providence, R. I., were on brief, for appellant.

Joseph Mainelli, U. S. Atty., Providence, R. I., with whom Arnold Williamson, Jr., and Samuel S. Tanzi, Asst. U. S. Attys., Providence, R. I., and Burton L. Williams, Atty., Internal Revenue Service, Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Rhode Island entered on May 20, 1955 which sentenced the defendant to imprisonment for a term of one year and to pay a fine of $5,000 after verdict of guilty by a jury.

The information filed by the United States Attorney charges "That during the calendar year 1951 George Winkler * * * had and received a gross income in excess of $600; that by reason of such income he was required by law,

after the close of the calendar year 1951, and on or before March 15, 1952, to make an income tax-return to the Collector of Internal Revenue for the District of Rhode Island stating specifically the items of his gross income and any deductions and credits to which he was entitled, that well knowing all of the foregoing facts, he did wilfully and knowingly fail to make said income tax-return to the said Collector of Internal Revenue * * * in violation of Section 145(a), Internal Revenue Code of 1939; 26 U.S.C. § 145(a)."

The Government filed on March 8, 1955 a bill of particulars which in substance sets forth that the defendant's income during the calendar year 1951 had been received from bookmaking (gambling) activities, "that the amount of total gross income was $22,328 received from bookmaking and that the total gross income, as set out above, represents gross receipts and is determined without reduction for losses."

Under § 22 of the Code, 26 U.S.C.A. § 22, gross income is defined to include " * * * gains or profits and income derived from any source whatever." We are concerned here with the question of whether a professional gambler has a gain or profit within the statutory meaning every time he wins a bet with one of his customers. If the answer to this question is in the negative, the judgment below must be reversed.

The evidence introduced by the Government tended to establish the following facts: that the defendant's income was from gambling; that he had never filed any income tax returns; that there was no record of the defendant's filing an income tax return for 1951; that he had been a gambler all his life; that over the years, and with no specific reference to 1951, he had made large amounts of money in the booking and gambling business although the precise amount was not specified.

Vincent Sorrentino, a manufacturing jeweler who was the chief witness for the Government, testified that he knew Winkler for about fifteen or sixteen years and placed bets with him for ten or eleven years; that Winkler gave Sorrentino a $1,000 credit to start and that later this was increased to $2,000; that Winkler on Sunday or Monday used to mail Sorrentino slips showing the daily bets Sorrentino placed with Winkler; that the records and slips which Sorrentino would receive showed the bets and also the minus and plus if Sorrentino owed money or Winkler owed Sorrentino money.

The Government also introduced in evidence a check of the Uncas Manufacturing Company, signed by Vincent Sorrentino, Treas., dated September 8, 1951, payable to Winkler in the sum of $1280 which Sorrentino testified was "in payment of money I owed to George Winkler for bets placed with him."

Sorrentino admitted that Winkler paid him some money in 1951 but he could not recall the amount although he admitted it was over $1,000.

A number of these weekly slips for 1951 were introduced into evidence by the Government but they admittedly did not cover all the betting transactions between Sorrentino and Winkler for the entire calendar year of 1951.

John M. Mullen, Special Agent of the Intelligence Division of the Internal Revenue Service, testified that he made an analysis and recapitulation of these slips; that the amount bet was $22,238; that the winnings on bets placed by Sorrentino with Winkler were $17,364; that there was a gain to Winkler of $4,964. Mullen further testified that in making this total recapitulation he did not take into consideration any payments that might have been paid by Winkler to Sorrentino and he did not try to ascertain how much money Sorrentino received from Winkler. He testified "I just computed these figures on these slips."

At the conclusion of the Government's evidence the defendant, pursuant to Rule 29, Fed.Rules Crim.Proc. 18 U.S.C.A.,

filed a motion for judgment of acquittal which was denied. The defendant then rested his case.

In his charge to the jury the trial judge said:

"As I stated to you a moment ago, there are two issues in this case: First, whether or not the defendant received a gross income in excess of $600 during the calendar year 1951; and, secondly, whether or not, having received that gross income in excess of $600, he did knowingly and willfully fail to file a tax return.

"With respect to the first of these issues, I instruct you that it is sufficient if the Government has established by proof beyond a reasonable doubt that the defendant during the calendar year 1951 had and received winnings in his occupation as a bookmaker in excess of $600.

"Under the Internal Revenue Code the term, 'gross income', includes gains, profits, and income derived from compensation for personal services of whatever kind and whatever form paid. It also includes gains, profits, and income derived from interest, dividends, securities, gains or profits or income derived from any source whatever. It makes no difference, as a matter of law, whether such income was derived from lawful or unlawful activities.

"Under the provisions of the Internal Revenue Code a person engaged in the business of bookmaking must, if the bets won by him during the calendar year exceeded the sum of $600, file a tax return showing the total amount of bets won by him. Under the Code he is then entitled, in order to arrive at his income tax, to deduct the total amount of bets lost by him up to but not in excess of the amount of bets, of the value of bets won by him.

\* \* \* \* \* \*

" \* \* \* It is not necessary for the Government to establish the precise amount of gross income received by the defendant or the precise amount of the bets or wagers won by him. It is sufficient if the Government has established by proof beyond a reasonable doubt that during the calendar year 1951 the defendant had and received income from winning bets in excess of $600."

Among other assignments of error, the defendant contends that the trial court committed prejudicial error in making the above charge to the jury concerning the meaning of gross income as the term relates to the defendant.

It is entirely clear that the Government's evidence will support a conviction only upon one of two theories of gross income: (a) total receipts, or (b) total winning bets. The trial court rejected the former theory and submitted the case to the jury upon the latter.

Before turning to a consideration of the cases which we cite below, it might be helpful to analyze in some detail the nature of the professional gambler's operation. In a certain sense a bookmaker may be likened to a merchant, one major difference being that instead of selling articles at a price exceeding the cost, the bookmaker, in effect, utilizes the laws of probability in such a way as to enable him to sell a certain indeterminate amount of money for a larger indeterminate amount of money, over an extended period of operation.

Let us consider the following somewhat over-simplified illustration. The operator of a lottery makes the following offer to each of ten prospective customers: "I will sell you one ticket for $1,000, and I promise to buy back or redeem one of these ten tickets at a price of $9,000. The winning $9,000 ticket will be selected by lot."

If we consider this transaction as in the nature of a sale of $9,000 for $10,000, then it would seem apparent that the $9,000 is actually "cost of goods

sold" and as such necessarily excluded from income.[1]

Regulations 118, Income Tax Regulations (1953);

"Sec. 39.22(a)–5 *Gross income from business*

"In the case of a manufacturing, merchandising, or mining business, 'gross income' means the total sales, less the cost of goods sold, plus any income from investments and from incidental or outside operations or sources. In determining gross income, subtractions should not be made for depletion allowances based on discovery value or percentage of income, selling expenses, or losses, or for other items not ordinarily used in computing cost of goods sold. But see § 39.23(m)–1(e)."

Moreover, the justification for excluding returns of capital from gross income goes deeper than mere Treasury Regulations and rests ultimately upon constitutional concepts. There is general agreement " * * * that amounts received as a return of capital or investment are not income within the general meaning of that term and may not be taxed under the Sixteenth Amendment." Mertens Law of Federal Income Taxation, Vol. 1, § 5.06 (1942).

Approaching the problem from another direction, it would not seem proper to regard the $9,000 as merely a deductible loss since in the consideration of the deductibility of losses " * * * it must be remembered that the statutory deductions are a matter of legislative grace. Questions of constitutionality do not intrude into the discussion; only those losses which are specifically allowed by statute may be deducted." Paul and Mertens Law of Federal Income Taxation, Vol. 3, § 26.25 (1934).

Of course it might be said that the operator of the $9,000 lottery is not selling $9,000 in actual cash, but is only selling his promise to pay $9,000 in cash. But even in this view it might be argued that a ticket which represents a reliable promise to pay $9,000 is in itself a capital asset.

■ Assuming, however, that the sale of these tickets did not constitute the sale of a capital asset, it nonetheless seems perfectly clear that the $10,000 was received only because a promise was made to pay out $9,000. And when it came into the possession of the lottery operator it was already impressed with and subject to a fixed obligation to pay out all but $1,000 of the total receipts. The mere fact that this obligation might not in some instances be legally enforceable seems of no consequence since from a business point of view the operator must clearly pay or cease operations regardless of the legal status of his debts. Under these circumstances we conclude that the operator of the lottery has a "gain" of only $1,000 within the meaning of § 22 of the Internal Revenue Code because only $1,000 came to him from the operation.

■ This view of the transaction is further supported by the basic nature of the loss deduction under § 23 of the Code, 26 U.S.C.A. § 23, which historically contemplated, among other losses, those resulting from fire, storm, shipwreck, and theft—in short, various unintentional misfortunes which every taxpayer naturally hopes to avoid. Obviously, it seems to us, the lottery operator's $9,000 payment is of an entirely different nature, being intentionally incurred and representing the necessary inducement which he must offer his customers in order to make his business productive. Accordingly, we believe that

---

1. Cf. Commissioner of Internal Revenue v. Weisman, 1 Cir., 1952, 197 F.2d 221 in which this court held that over-ceiling payments were allowable in their entirety as part of cost of goods sold in computing gross income for a tax year in which

the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., made such payments illegal but did not expressly forbid their disallowance in determining costs for tax purposes.

this $9,000 must be regarded as exclusion from gross income rather than a "loss" under § 23 which Congress could in its discretion deny the taxpayer.

Of course the operation of a bookmaker differs from a lottery in some respects, chief among which is the possibility that losses on any given transaction may exceed gains—that is to say, losing bets may exceed winning bets with respect to any particular race.

This raises additional questions as to what constitutes gross income of a bookmaker as contrasted with the gross income of the lottery operator who knows that he cannot have a net loss on the entire transaction.

There are at least four possible theories upon which a bookmaker might calculate his gross income:

I. (a) Total receipts less total payments to winning bettors over the year.

(b) Total winnings on winning bets less total losses on losing bets over the year.

(c) Total net winnings on winning races less total net losses on losing races over the year.

(These three methods are merely different ways of phrasing the same economic concept leading to the same mathematical result.)

II. Total winnings on winning races over the year.

III. Total winning bets over the year. (This is the theory of the trial court.)

IV. Total receipts over the year.

(This was urged by the Government along with III above, but was rejected by the trial court.)

The practical differences between the four theories set forth above can perhaps best be illustrated by a concrete example. Let us assume that a bookmaker accepts one $200 wager on each horse in each race throughout the year. For purposes of convenience this hypothetical bookmaker's business covers only twelve races in the course of the year.

| Races | Total Receipts or Bets | Paid Out | Winning Bets | Losing Bets | Profit or Loss |
|---|---|---|---|---|---|
| 1.[2] | $1400 | $ 800 | $1200 | $ 600 | +$ 600 |
| 2. | 1200 | 600 | 1000 | 400 | + 600 |
| 3. | 1200 | 2000 | 1000 | 1800 | — 800 |
| 4. | 1000 | 400 | 800 | 200 | + 600 |
| 5. | 1200 | 1000 | 1000 | 800 | + 200 |
| 6. | 1000 | 1600 | 800 | 1400 | — 600 |
| 7. | 1200 | 1600 | 1000 | 1400 | — 400 |
| 8. | 1200 | 1200 | 1000 | 1000 | — |
| 9. | 1000 | 2000 | 800 | 1800 | — 1000 |
| 10. | 1000 | 1800 | 800 | 1600 | — 800 |
| 11. | 1200 | 800 | 1000 | 600 | + 400 |
| 12. | 1200 | 1000 | 1000 | 800 | + 200 |
| Totals: | $13,800 | $14,800 | $11,400 | $12,400 | —$1,000 |

2. In the first race there are seven horses. Each of seven bettors makes a bet of $200 to win on a different horse for a total of $1400; the winning horse pays $800 (which includes the winning bettor's original $200) leaving a profit of $600 to the bookmaker on the first race. The bookmaker took in $1200 on his winning bets which represents $200 bet on each of the six horses which did not win. He paid out $600 to the successful bettor on the winning horse, thus coming to the same $600 net profit to the bookmaker on the first race.

Total profit on winning races—$2,600

Total loss on losing races—$3,600.

Gross income would be calculated as follows:

I. (a) Total receipts less total payments to winning bettors over the year; $13,800 less $14,800, or minus $1,000.

I. (b) Total winnings on winning bets less total losses on losing bets over the year; $11,400 less $12,400, or minus $1,000.

I. (c) Total net winnings on winning races less total net losses on losing races over the year; $2,600 less $3,600, or minus $1,000.

It will be seen that under this conception gross income would be zero with a net loss from the entire year's operations of $1,000 which might or might not be deductible under the provisions of § 23. This $1,000 loss is clearly of a kind which Congress could in its discretion properly deny. If it were denied the result would merely be that the taxpayer could not apply his net gambling losses against unrelated income or against income for other years. This would seem to be entirely within the scope of Congressional authority.

II. Total winnings on winning races over the year, or $2,600. This would leave $3,600 lost on losing races as a deduction which Congress could in its discretion deny. This $3,600 breaks down into two logically distinct categories:

A. $1,000 net loss, as indicated above.

B. $2,600 which represents the amount lost on losing races up to the amount won on winning races.

There seems to us a serious question whether this $2,600 may be regarded as a deduction which Congress could in its discretion deny, or whether it ought not properly to be regarded as an exclusion from gross income.

It should be noted that these are not the kinds of payments previously discussed which are unavoidable and de-liberately incurred for purposes of inducing customers to make bets. On the contrary, the bookmaker need not ever sustain a losing race—though losing bets, of course, are inevitable. But he knows that losing races are a distinct possibility, perhaps even a probability, on occasion, and he hopes to utilize the laws of probability in such a way that over an extended period his winnings on winning races will exceed these losses on losing races with a net profit resulting over the entire operation.

It seems to us highly doubtful that Congress can, in its discretion, view the business in such a radically different light from that in which the taxpayer himself regards it, with the result that whereas the taxpayer who entered into these transactions with the expectation of balancing losses against gains over the year, and who would be foolish to enter into the business on any other basis, must nonetheless calculate his gross income on the basis of gains on winning races alone, leaving all losses on losing races to be granted as a deduction which Congress may or may not in its wisdom see fit to grant.

In every tax year the bookmaker will have some winning races and some losing races. In the above illustrative case the bookmaker won $2,600 on winning races and lost $3,600 on losing races. Yet, in this view, Congress can tax him on $2,600 despite the fact that his business, as he understands it, and as any businessman would understand it, shows an actual loss of $1,000 over the anticipated yearly period of operations.

III. Total winning bets over the year, or $11,400. This would leave $12,400 in the category of losses deductible in the discretion of Congress. This figure includes:

A. $1,000 net loss as indicated above.

B. $2,600 loss on losing races up to the amount of winnings on winning races, as above.

C. $8,800 which represents the yearly total of the amount of losing bets in each race up to the amount of winning bets in each corresponding race.

Although it is perhaps possible that Congress could in its discretion deny the $2,600 total losses on losing races (the amount by which losing bets exceed winnings bets on any given race) it seems to us completely inconceivable that Congress could, if it chose, deny this $8,800 total which represents losing bets up to the amount of winning bets throughout the year. This figure includes the necessary and inevitable payments in each individual race which provide the inducement to customers, sustaining the entire operation and without which there could not possibly be any winning bets or gains of any kind, taxable under any theory of gross income.

■ IV. Total receipts over the year, or $13,800. This would leave $14,800 as a deduction allowable in the discretion of Congress, which breaks down as follows:

A. $1,000 net loss as above.

B. $2,600 total losses in losing races, as above.

C. $8,800 total losing bets up to the amount of winning bets, as above.

D. $2,400 which represents money left with the bookmaker (customer's $200 winning bet in each of 12 races) which he had only temporarily in his custody and which was returned to the winning bettor in each race along with his winnings.

Clearly this $2,400 is an exclusion from gross income and the trial judge was correct in rejecting the gross receipts theory of gross income which would treat this $2,400 as a loss deductible in the discretion of Congress. It was never the bookmaker's in any sense and could not constitute a part of his gross income.

We now turn to significant cases. In James P. McKenna, 1925, 1 B.T.A. 326, gross income of a professional gambler

was determined to be as set forth in the first of the four theories above—that is, total receipts less total payments over the year, or, in terms of our illustration, $13,800 minus $14,800. In this view the only portion of the total payments for the year to be treated as deductible only in the discretion of Congress is the $1,000 net loss over the entire yearly operation. All other payments are treated as offsetting gains prior to the determination of gross income.

This case was followed shortly by the case of Mitchell M. Frey, Jr., Ex'rs, 1925, 1 B.T.A. 338, which applied the same concept of gross income to a casual gambler. The Board of Tax Appeals said at pp. 341 and 342, of 1 B.T.A.:

"It now remains for us to consider the amount of the losses sustained by the deceased from his gaming. In his returns he asserted that he had won $900 during the year 1919 and $26,588 during 1920. As a matter of fact he won nothing and his reported winnings should be disregarded in computing the tax. The Commissioner has argued that each gaming venture is a separate item; that those in which winnings were made stand apart from those in which money was lost and that the totals of the winnings must be returned and taxed, while the totals of the losses may not be deducted.

"The fallacy of this contention is well pointed out in Appeal of James P. McKenna, 1 B.T.A. 326, and requires no further comment here. The decedent's operations extend through annual periods and his income tax returns were made for like periods as required by the revenue acts. We can no more segregate the varieties of the gambling operations for each year and make distinction thereon than we can say that, in a game of *dealer's choice* poker, the winnings or losses of each hand dealt must be segregated because there was a variation in the form of game in each hand. In consequence of his gambling, Scaife

actually lost $25,205 in 1919 and $38,408 in 1920. For the reasons set forth in this opinion, these amounts can not be allowed as deductions."

We believe that the Frey decision was unfortunate in that it disregarded two very real distinctions between the activities of the professional and the casual gambler. First, the casual gambler has no inevitable losses of the type included within the $8,800 figure in our illustrative case above, or representing the cost of goods raffled off in a lottery. Conceivably the casual gambler might never sustain a "loss" of any kind whatsoever.

Moreover the casual gambler ordinarily does not view his transactions as a yearly operation. That is to say, even if he should sustain losses he views them as isolated incidents unrelated to his winnings, not intending to exploit the laws of probability in such a way as to emerge with a favorable balance over an extended period of operations. Since the casual gambler views his bets individually as isolated incidents, there seems no good reason why the taxing authority should not do likewise. The professional, by way of contrast, founds his business directly upon the operation of the laws of probability over an extended period of time. When the taxing authority chooses to view his business as a series of unrelated individual transactions it does violence to the truth and arbitrarily deprives him of the benefit of the laws of probability upon which his enterprise is necessarily founded and without which it cannot succeed over any substantial period.

But regardless of the merits of the decision in the Frey case, a casual gambler was thereby permitted to exclude from gross income total winnings up to the amount of total losses in the same fashion as a professional gambler. In both McKenna and Frey, all of the gambling involved was illegal under state laws.

In addition, the professional gambler, if he suffered a net loss over the year, could at that time deduct it under the provision equivalent to § 23(e) (1) of the Internal Revenue Code of 1939 where the losses were legally enforceable obligations.[3]

The casual gambler, however, had to bring himself within the provisions of § 23(e) (2) in order to get a deduction for net losses. Thus, in addition to showing that his gambling debts were legally enforceable, he also had to show that the transactions had been "entered into for profit."

Losses sustained in illegal gambling operations, because not legally enforceable, were not allowed under either § 23(e) (1) or § 23(e) (2).

In 1934, with the law in this status, Congress enacted the provision that would become § 23(h) of the 1939 Code: "Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." The effect of § 23(h) upon § 23(e) was determined in Humphrey v. Commissioner of Internal Revenue, 5 Cir., 1947, 162 F.2d 853, 175 A.L.R. 363, certiorari denied 1947, 332 U.S. 817, 68 S.Ct. 157, 92 L. Ed. 394. In that case the taxpayer was not a professional gambler. He engaged in only three wagering transactions. On two winning bets he made $2,140. On his losing bet he lost $3,000.

The Court held, in effect, that the $2,140 was gross income and that $2,140 of the $3,000 loss constituted an allowable deduction under § 23(h) despite the fact that the taxpayer made no showing that he could qualify under § 23(e) (2) as a "transaction entered into for prof-

---

3. No case has been found in which reference was made to that provision, probably for the reason that the professional could also use the equivalent of § 23(e) (2) more easily. See Skeeles v. United States, 1951, 95 F.Supp. 242, 245, 246, 118 Ct.Cl. 362. However, there is no reason to doubt that § 23(e) (1) could have been invoked in view of the decisions allowing casual bettors to invoke § 23 (e) (2).

it." The Court said at p. 855 of 162 F. 2d:

" * * * We need not go behind Section 23 as it appears therein. It reads: 'In computing net income there shall be allowed as deductions * * * (h) Wagering Losses. Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions. * * * ' There follow other classes of deductions through the letter (s). It is argued that Par. (h), Wagering Losses, is only a gloss on or an addition to Par. (e), and that (e) still governs such losses. We do not think so. If that had been the intent of Congress the matter of (h) would simply have been placed in (e). Instead the deductions (f) and (g) intervene, and are independent of (e); as is (h) which follows them. Each lettered paragraph authorizes a class of deductions. Wagering losses are made a class to themselves and 'shall be allowed as deductions', but 'only to the extent of gains from such transactions.' No longer need it be inquired whether the wagers were illegal so that the loss need not have been paid; nor what the state of mind of the taxpayer was as respects his purpose to win a profit. All wagers are by Par. (h) gathered into a class of their own and dealt with as the paragraph states. It is not necessary for the loser to prove he intended to win. The deduction for the losses ought to be allowed to the extent Sec. 23(h) requires."

▋ In other words, § 23(h) was not just an additional restriction upon § 23(e) but was in substitution therefor so far as wagering transactions are concerned.[4]

It is important to note, at this juncture, that § 23(h) had one important effect entirely separate and distinct from the one ordinarily assigned to it as exemplifying the congressional intent. It is clear that Congress intended to eliminate the difference between the treatment accorded to legal and illegal gambling losses. Legal net losses over the year, as we have seen, could be deducted under § 23(e). Illegal net losses could not be deducted at all. But regardless of legality or illegality, winnings were excluded from gross income up to the amount of total losses.

With the law in this condition, Congress could have eliminated the distinction between legal and illegal gambling losses simply by providing that no net gambling losses of any kind could be taken under § 23(e). This approach would have left the concept of gross income set forth in the McKenna and Frey cases unimpaired. Instead, it chose to employ the language of § 23(h). Accordingly, to the extent that § 23(h) controls, winning bets can no longer be excluded from gross income up to the amount of losing bets, since, if this were done, there could be no "gains" to which the "losses from wagering transactions" could be applied as a deduction. Therefore, it will be seen that, in addition to carrying out the legislative intent of eliminating the distinction between legal and illegal gambling losses, § 23(h) also had the effect of altering the then existing definition of gross income insofar as constitutional considerations would permit. That is, as to a casual gambler, the losses up to the amount of gambling winnings, formerly considered an exclusion from gross income under the Frey case, were now to be treated as a deduction.[5] Further, the casual gambler's use of losses was limited to that amount by the new subsection. But as to a pro-

---

4. But cf. Internal Revenue Code of 1954, § 165, 26 U.S.C.A. § 165; H.R.Rep. No. 1337, 83d Cong., 2d Sess., 3 U.S.Code Cong. & Admin. News, p. 4182 (1954).

5. See H.R.Rep. 704, 73d Cong., 2d Sess., 22 (1934): "Under the present law many taxpayers take deductions for gambling losses but fail to report gambling gains. This limitation will force taxpayers to report their gambling gains if they desire to deduct their gambling losses."

fessional, we believe that Congress lacked the power to undo the McKenna rule by statutory change and therefore that the new section could affect the professional only by barring his former right to deduct legal net gambling losses against other forms of income. Losses up to the amount of gambling winnings continue to be a reduction of the amount to be reported as gross income by the professional gambler. The holding of the Humphrey case, as distinguished from any dicta therein, is not inconsistent with this analysis, because taxpayer Humphrey was a casual gambler.

In Skeeles v. United States, 1951, 95 F.Supp. 242, 244, 118 Ct.Cl. 362, certiorari denied 1951, 341 U.S. 948, 71 S.Ct. 1014, 95 L.Ed. 1371, which was an action for a refund of overpayments of income taxes, the Court said:

> "This background is given as an aid to the interpretation of the statute. For the occasional wagerer no carry-over deduction is allowed. To sustain the contention of plaintiff it is necessary to extend to the professional gambler tax-deduction privileges that are not accorded to one who bets occasionally. To reach such a conclusion in the face of the public viewpoint and legislative purposes generally would require a clearly worded statute that precludes any other reasonable conclusion."

The Court went on to decide that § 23(h) was applicable to the professional gambler, with the result that a net operating loss carry-over was denied. Accord, Offutt v. C. I. R., 1951, 16 T.C. 1214.

■■■ We regard the decisions in the Skeeles and Offutt cases as not controlling. They dealt with attempts to utilize net gambling losses as an offset against the income of a different taxable year. As with the attempt to offset net gambling losses against other forms of income in the same taxable year, this question is properly a matter in which Congress could limit the professional as well as the casual gambler. On the other hand, the question in the present case is not one of defining deductions from gross income but rather of defining what is gross income. As already stated in this opinion, we believe there are inherent limitations upon the congressional power to deal with this matter.

To summarize briefly, we think that it is perhaps conceivable that Congress could, in its discretion, deny to a professional gambler the right to deduct from his total net winnings on winning races the total of his net losses on losing races in calculating the amount of his gross income. But we believe that Congress is without power to deny the professional gambler the right to offset his winnings on each race with his losses in that same race before coming to a "gain" of the type which constitutes gross income under § 22 of the Code. In other words, the appropriate unit for calculating his "gains" under § 22 may or may not be the net result over the yearly operation, but in any event it cannot be a unit which encompasses anything less than the total of his net profits (winning bets less losing bets) on every race.

We need not now decide which of these two theories constitutes the true definition of a professional gambler's gross income. He has no gain at all within the meaning of § 22 unless his winnings in a particular race exceed his losses in that same race. Accordingly, it follows that the trial judge's charge in regard to what constitutes the appellant's gross income was erroneous.

It becomes unnecessary to consider the other contentions of the appellant in view of our ruling here.

The judgment of the district court is reversed.

MAGRUDER, Chief Judge (concurring).

Although the opinion of the court is premised upon constitutional objections to the definition of a professional gambler's gross income given in the district

court's instructions to the jury, I think there is no fundamental constitutional impediment involved. Cf. Commissioner v. Weisman, 1 Cir., 1952, 197 F.2d 221, 224–226. It must be remembered that this was a prosecution for failure to file a return, not a suit to collect a tax upon the gross receipts of the defendant. The limitations upon the congressional power to define gross income, as indicated in the court's opinion, do not have to be carried over, as a constitutional imperative, to the congressional power to require the making of a return by a class of persons, or to the congressional power to punish criminally a willful failure to make such a return.

The trouble is that Congress, having defined "gross income" in § 22(a) of the 1939 Code, I.R.C.1954, § 61(a), in terms applicable to all classes of taxpayers and equivalent to the maximum amount which could be subjected to taxation under the concept of income in the Sixteenth Amendment, went on to use the term "gross income" repeatedly throughout the Internal Revenue Code. The primary purpose of the § 22(a) definition, as modified by the "exclusions from gross income" listed in § 22(b), is to determine the starting figure from which the "net" or "taxable" income is computed by subtracting statutory "deductions." See § 21, I.R.C.1954, § 63. But there can be no doubt, in view of the integrated structure and careful definitions that typify the Internal Revenue Code, that the term "gross income" is used throughout that massive statute as a "word of art," with the constant meaning spelled out for it in § 22. Thus our examination of the statutory and constitutional concept of gross income in this case was forced by the choice Congress made of expressing the requirement of a return, in § 51(a), by reference to that term: "Every individual having for the taxable year a gross income of $600 or more shall make a return * * *." I.R.C.1954, § 6012(a). It was for willful failure to comply with the duty so defined that defendant was indicted under § 145(a). I.R.C. 1954, § 7203.

The power of Congress to exact information that will be helpful in effectuating the collection of taxes is not so limited by any constitutional requisite. It is clear that the duty to make returns, or to keep financial records, may be imposed upon persons who, in the end, are found to be not liable for any tax. Congress could define the reporting duty of professional gamblers in terms of a given amount of gross receipts or a given total of individual wagers won from bettors. Or it could compel the gamblers, or indeed all of us who are potential taxpayers, to make annual returns regardless of whether a particular individual took in any "gross income" or even any gross receipts. This may be what Congress has done in requiring a return from "Every corporation subject to taxation under this chapter", § 52(a), and from the fiduciary for "Every estate or trust of which any beneficiary is a nonresident alien," § 142(a). I.R.C.1954, § 6012(a). Other sections of the Code require a return from organizations which as a class are not subject to taxation at all. See § 54(f) (certain exempt organizations); § 187 (partnerships). I.R.C.1954, §§ 6033, 6031. Indeed, "information" returns of various types are demanded in some cases from persons who have merely made payments to others, as an aid in determining the tax liability of the recipients. E. g., §§ 147–49. I.R.C. 1954, §§ 6041–45. All of these reporting requirements would seem to have a reasonable relation to the collection of taxes imposed by the Internal Revenue Code. I have no doubt that Congress could also write an effective reporting requirement for professional gamblers, so long as an allowance (whether denominated an "exclusion," a "deduction," or a "credit") is made for losses in computing the taxable income, to the extent required by the constitutional concept of income, as explained in the opinion of the court.

Congress could also authorize the Secretary or the Commissioner to promulgate a reporting requirement by appropriate regulations. Indeed, it may have already conferred such authority in § 54. I.R.C.1954, § 6001.

"§ 54. *Records and special returns*

"(a) By taxpayer. Every person liable to any tax imposed by this chapter or for the collection thereof, shall keep such records, render under oath such statements, make such returns, and comply with such rules and regulations, as the Commissioner, with the approval of the Secretary, may from time to time prescribe.

"(b) To determine liability to tax. Whenever in the judgment of the Commissioner necessary he may require any person, by notice served upon him, to make a return, render under oath such statements, or keep such records, as the Commissioner deems sufficient to show whether or not such person is liable to tax under this chapter."

The Income Tax Regulations [Reg. 118, 26 C.F.R. Part 39 (1953)] do not show any use that has been made of this authority that is relevant to the problem of exacting returns from gamblers. But the Commissioner has imposed certain reporting requirements supplementary to those enumerated in the statute itself. E. g., 26 C.F.R. § 39.101–1(a), (j) (exempt organizations), § 39.142–5 (fiduciaries for nonresident alien beneficiaries), § 39.146–1(b), (c) (aliens departing from United States). The statutory authority quoted above would seem to be broad enough to permit a like solution in defining when professional gamblers must make returns.

Thus the difficulty our decision in this case presents to the Government in prosecuting a gambler for willful failure to file a return, although it is founded on constitutional considerations, is easily capable of removal by action of Congress or of the Treasury Department.

WOODBURY, Circuit Judge (dissenting).

While I agree with Judge MAGRUDER in his analysis of the power of Congress to require reporting of financial transactions, we are not here directly dealing with that question, for Congress has in § 51(a) equated reporting requirements with its definition of "gross income" in § 22(a). This in turn brings us directly to the income taxing power of Congress, because it is well accepted that Congress in general intended "gross income" to be co-extensive with the word "income" in the 16th Amendment. See Rutkin v. United States, 1952, 343 U.S. 130, 139, 72 S.Ct. 571, 96 L.Ed. 833. We are required, it is true, to answer the constitutional question only because Congress utilized a constitutional limitation in defining words in a statute. But this does not alter the fact that to reach a proper result in the present case we must interpret the Constitution.

It is thus necessary to make three inquiries: 1. What, in general, is the outside limit of Congress' power to tax gains from sales under the 16th Amendment? 2. Did Congress intend in this class of cases to go to that outside limit? 3. What is the outside limit as applied in this particular case?

When an individual sells a piece of property, there is no question but that generally speaking it is beyond the power of Congress under the 16th Amendment to tax his total receipts without diminution for the cost of the property to him. This is because the only "income" to him is his gain, not the total selling price. However, there is clearly no constitutional requirement that he be permitted to exclude from his gain on one sale any losses that he may have from other unrelated sales. The exclusion of such losses is a matter of legislative grace. Thus, in general the "gross

income" from sales of any person during a year is his total gains on all profitable sales without exclusion of losses on unprofitable sales. And this is the outside limit of 16th Amendment "income."

But does that outside limit apply in all cases? The answer is in the negative if Regulation 118, § 39.22(a)–5 is correct. That Regulation defines "gross income" of merchandizing businesses as containing a built-in exclusion of losses from losing sales. This effect is reached by the acceptance of the "cost-of-goods-sold" method of accounting over an annual period: total receipts less cost-of-goods-sold equal gross income. If there were any unprofitable sales whatever "gross income" is thus less than if it were defined as total gain on all profitable sales. That § 39.22(a)–5 is a correct interpretation of § 22(a) is indicated by long-time acquiescence thereto by Congress and a consideration of the impracticability of a different application to most merchants. Thus in my view to this extent Congress has not pushed its definition of "gross income" to the limit of 16th Amendment "income." And therefore I must disagree with any intimation in Judge HARTIGAN'S opinion that Congress is required by the 16th Amendment to use the § 39.22(a)–5 method in computing any merchant's taxable income.

Viewing the nature of his operations, it seems proper that the professional bookmaker should be treated in this respect like more typical merchants, provided Congress has not legislated to the contrary. But Congress has so legislated in § 23(h) of the Internal Revenue Code. I agree with Judge HARTIGAN in his conclusion that by enacting § 23 (h) Congress intended to include in § 22(a) all "gross income" of gamblers that it could under a 16th Amendment definition. However, he believes the only change effected by § 23(h) is as to casual gamblers, whereas there seems no reason why it should not apply equally to those engaged in the business of gambling so as to deny them the exclusion granted other merchants as a matter of legislative grace under the § 39.22 (a)–5 interpretation of § 22(a). Thus, as to *all* gamblers § 23(h) requires an equation of "gross income" with 16th Amendment "income." The "gross income" of a professional bookmaker is, therefore, the total of his gains on profitable "sales" without any diminution for losses on unprofitable "sales."

The only remaining problem is the determination of what constitutes, in this context, a "sale" by a professional bookmaker. The sole basis for upholding the decision below (other than by accepting gross receipts as gross income, which seems clearly incorrect) is to find that each bet won or lost by the bookie is a "sale." For only under that definition did the Government succeed in showing that the defendant had a gross income in 1951 in excess of $600. This view would apparently be contrary to the views expressed by my colleagues which indicate that a single race is the smallest unit which Congress may constitutionally treat separately. Indeed, Judge HARTIGAN intimates that even this unit may be too small.

In considering this problem it should be kept in mind that we are not called upon to decide categorically whether a single bet or the bets on a single race constitute the unit most closely analogous to the usual concept of a "sale." Instead our inquiry is: which of these units is the smallest transaction which has enough independence of other transactions so that Congress could properly tax it as a separate and single transaction, *i. e.* "sale."

I am not convinced, as my colleagues appear to be, that the race is the smallest separable unit of the bookie's business. The only thing that sets off an individual race as a unit in the bookie's business is that if more than one horse is bet on to win he is sure of having some winning bets, and if all the horses are bet on to win he is sure of having a

losing bet. This alone seems insufficient to change the usual concept that all parties to a "sale" have some relation to each other. Certainly there is no such relationship here, where the amount Bettor A loses has no effect on the amount Bettor B wins. It should be pointed out that the bookie differs in this respect from a pari-mutuel racetrack, for the bookie creates no pool of money from which he draws his share, paying out the remainder to winning bettors. In such a case there would be a relationship between all bettors, since the amount each bets affects the winnings of all winners. There it would be more reasonable to accept a race as a unit of sale. But this is not the case with the bookie, and we can properly say that each bet is sufficiently analogous to a "sale" so that Congress could tax it separately without reference to other bets on the same race. This conclusion is bolstered by the realization that no one questions that as to the bettors each bet is a separate transaction. Thus the views expressed by Judge HARTIGAN lead to the conclusion that as to one party to the transaction there is a "sale," but as to the other (the bookie) there is not.

At first glance it may seem strained to hold that something which is either 100% gain or 100% loss constitutes a sale. But that is the very nature of betting, and the difficulty comes in trying to fit such transactions into customary business definitions such as "sale" or "cost-of-goods-sold." This all-or-nothing aspect should not be permitted to obscure the fact that a bet is essentially a single sale of money to one person, gambling instinct providing the incentive for one party, favorable odds the incentive for the other.

If a single bet is the unit of sale, the Government below proved adequately that Winkler had "gross income" in 1951 in excess of $600 from betting "sales," and the charge to the jury was proper. For these reasons I would affirm.