**Eli WALLACH and Anne (Jackson) Wallach**

v.

**The UNITED STATES.**

**No. 731–83T.**

United States Claims Court.

Aug. 9, 1985.

Laurence Keiser, New York City, for plaintiffs. David M. Stern, of counsel.

Ellen C. Specker, Washington, D.C., with whom were Asst. Atty. Gen., Glenn L. Archer, Jr., and Mildred L. Seidman, Washington, D.C., for defendant.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

WHITE, Senior Judge.

The plaintiffs, who are husband and wife and prominent professional actors, sue for the recovery of the amounts of additional income tax (and assessed interest) which the Internal Revenue Service (IRS) required the plaintiffs to pay for each of the years 1978 and 1979.

### The Minimum Tax

The additional tax for 1978 was assessed by the IRS under section 56(a) of the Internal Revenue Code of 1954 (the Code), as amended by section 301(a) of the Tax Reform Act of 1976 (90 Stat. 1520, 1549). As effective for the year 1978, this section imposed (in addition to any other income tax which might be due from a taxpayer) a tax equal to 15 percent of the amount by which the sum of the "items of tax preference" exceeded the greater of $10,000 or the regular tax deduction for the taxable year.

Various "items of tax preference" were defined in section 57(a) of the Code, as amended by section 701(b)(1)(A), (b)(5) of the Revenue Act of 1978 (92 Stat. 2763, 2898). One of the "items of tax preference" was referred to as "adjusted itemized deductions"; and this particular category was defined in paragraph (1) of section 57(a) as "an amount equal to the adjusted itemized deductions for the taxable year (as determined under subsection (b)."

Subsection (b) of section 57 defined "adjusted itemized deductions" as the amount by which the sum of the itemized deductions for any taxable year (with certain specified exclusions) exceeded 60 percent of the taxpayer's adjusted gross income for the taxable year.

Effective for the year 1979 and subsequently, the Code was amended by section 421(a) of the Revenue Act of 1978 (92 Stat. at 2871–72) to include a new section numbered 55 and entitled "Alternative Minimum Tax for Taxpayers Other Than Corporations." It provided a different formula

from that in section 56 for the imposition of a minimum tax on taxpayers other than corporations. The minimum tax for 1979 was assessed against the plaintiffs by the IRS under section 55.

The "tax preference" item of "itemized adjusted deductions" was still subject to the minimum tax in 1979, as in 1978; and the definition of the item for 1979 was basically similar to the definition for 1978.[1]

### The "Repo" Transactions

The assessment of the minimum tax against the plaintiffs for 1978 under section 56 and for 1979 under section 55 was based in each instance upon certain so-called "repo" transactions in which the plaintiffs were engaged during the particular year.

During 1978, for example, the plaintiffs' repo transactions involved the purchase and carrying of three U.S. Treasury notes, a Federal Intermediate Credit Bank note, and a bank certificate of deposit. The securities were purchased by the plaintiffs from Cantor, Fitzgerald & Co. (Cantor), a securities broker, for a total purchase price of $12,760,596. The plaintiffs paid Cantor $228,532 of the purchase price, and borrowed the remainder of the purchase price, or $12,532,064, from Cantor.

In connection with each of the purchase transactions referred to in the preceding paragraph, the plaintiffs contemporaneously "sold" the security back to Cantor, subject to an obligation on the part of the plaintiffs to repurchase the security at the same price (hence, the term "repo" transaction).

The yield to maturity on the securities was fixed and would not fluctuate, but the cost of the funds borrowed by the plaintiffs from Cantor could fluctuate daily, depending on the cost of money.

During 1978, the plaintiffs paid Cantor the total amount of $415,806 as interest on the funds borrowed from Cantor in connection with the repo transactions. During

that same year, the plaintiffs' income from the repo securities totaled $320,967, or $94,839 less than the interest on the repo borrowings.

During 1979, the plaintiffs were also involved in repo transactions with Cantor. The interest paid by the plaintiffs to Cantor in 1979 on the plaintiffs' repo borrowings totaled $1,020,985. The plaintiffs' income in 1979 from the repo securities totaled $699,296, or $321,689 less than the interest charges on the repo borrowings.

### Administrative Proceedings

For each of the years 1978 and 1979, the plaintiffs included in their joint income tax return the income from repo securities as part of their gross income. They also included, among their itemized deductions, the amount of the interest paid on repo borrowings (to the extent permitted by section 163(b) of the Code, which imposed a limitation on the amount of interest that could be deducted in connection with investment indebtedness).

On audit of the plaintiffs' income tax returns for 1978 and 1979, the IRS determined that, as a result of the taxpayers' repo interest deductions, the taxpayers had a tax preference item for each year based upon their adjusted itemized deductions, because the deductions exceeded 60 percent of the plaintiffs' adjusted gross income. The IRS also decided that this tax preference item was includable in the minimum tax base for each year.

The IRS issued tax deficiencies for the respective years, which the taxpayers paid, with assessed interest.

Subsequently, the taxpayers filed timely claims for refund, which the IRS denied.

The present action followed.

### Discussion

The thrust of the plaintiffs' argument is that the minimum tax, as applied by the IRS in this particular case, was a tax on a direct cost of earning income and, there-

---

1. See section 701(b)(4), Revenue Act of 1978 (92 Stat. at 2899), for 1978 version of section 57(b) of the Code, and section 421(b)(3), Revenue Act of 1978 (92 Stat. at 2874), for 1979 version.

fore, amounted to the unconstitutional taxation of capital. According to the plaintiffs, they do not contend that the minimum tax is unconstitutional *per se*, and they do not contend that the concept of limiting itemized deductions to 60 percent of adjusted gross income is unconstitutional. Rather, the plaintiffs assert that the IRS has unconstitutionally applied the minimum tax to their situation.

The plaintiffs do not cite any court decision which directly supports their position. The plaintiffs rely primarily upon the discussion of income tax deductions in *Davis v. United States*, 87 F.2d 323 (2nd Cir.), *cert. denied*, 301 U.S. 704, 57 S.Ct. 937, 81 L.Ed. 135 (1937). The court in that case upheld the validity of a statutory provision (section 23(r), Revenue Act of 1932, 47 Stat. 183) which limited income tax deductions for losses sustained from sales or exchanges of stocks and bonds, held for 2 years or less, to the extent of any gains from such sales or exchanges.

In the course of the discussion, however, the court in *Davis*, 87 F.2d at 324–25 indicated that income tax deductions fall into two categories. The first category, according to the court, consists of "certain necessary items like cost of property sold; ordinary and necessary expenses incurred in getting the so-called gross income; depreciation, depletion, and the like * * *." Items of this type, said the court, are deducted from gross income in order to determine the taxpayer's actual income. Such deductions, according to the court, are not to be confused "with deductions of another sort like personal exemptions; deductions for taxes paid; losses sustained in unrelated transactions and other like privileges which Congress has seen fit to accord to income taxpayers." The court went on to say that, while deductions of the first type "are inherently necessary as a matter of computation to arrive at income, the second may be allowed or not in the sound discretion of Congress," as they "are allowed by Congress wholly as a matter of grace."

Actually, the decision in *Davis* does not provide support for the plaintiffs' argument. As previously stated, the court in *Davis* actually upheld a statutory provision which specifically limited deductions for losses sustained from sales or exchanges of stocks and bonds to the extent of any gains realized by the taxpayer from similar sales or exchanges during the same year. This statutory provision restricted the right of taxpayers to deduct costs of earning money, and was regarded by the court as being within the discretionary power of the Congress.

The plaintiffs also seek to derive support from *Winkler v. United States*, 230 F.2d 766 (1st Cir.1956). The appellant in that case (defendant below) had been convicted in a United States District Court for willfully and knowingly failing to file an income tax return for the calendar year 1951. The evidence presented by the Government at the trial established that the defendant had been a gambler all his life and his income was derived from gambling; that his gross income from gambling for 1951 was in excess of $600 (taxable income in this amount made the filing of an income tax return mandatory); and that there was no record of the defendant having filed an income tax return for 1951. At the conclusion of the Government's case before the trial court, the defendant filed a motion for judgment of acquittal, which was denied. The defendant then rested his case without introducing any evidence. Hence, the trial court record did not contain any evidence concerning the amount of the defendant's gambling losses.

The trial judge instructed the jury in part as follows:

Under the provisions of the Internal Revenue Code a person engaged in the business of bookmaking must, if the bets won by him during the calendar year exceeded the sum of $600, file a tax return showing the total amount of bets won by him. Under the Code he is then entitled, in order to arrive at his income tax, to deduct the total amount of bets lost by him up to but not in excess of * * the value of bets won by him.

\*　　\*　　\*　　\*　　\*　　\*

* * * It is sufficient if the Government has established by proof beyond a reasonable doubt that during the calendar year 1951 the defendant had and received income from winning bets in excess of $600.

The judgment of the trial court was reversed by the appellate court, which held that the charge to the jury was erroneous.

The appellate court, in analyzing the nature of the professional gambler's operation, said (230 F.2d at 769) that he, "in effect, utilizes the laws of probability in such a way as to enable him to sell a certain indeterminate amount of money for a larger indeterminate amount of money, over an extended period of operation."

A distinction is to be drawn, the court indicated (230 F.2d at 774), between the professional gambler and the casual gambler. The casual gambler, according to the court, ordinarily does not view his transactions as a yearly operation, but views his losses (if any) as isolated incidents unrelated to his winnings; and, as the casual gambler views his bets individually as isolated incidents, there is no good reason why the taxing authority should not do likewise. The professional gambler, on the other hand, "founds his business directly upon the operation of the laws of probability over an extended period of time"; and when the taxing authority views the professional gambler's business as a series of unrelated individual transactions, "it does violence to the truth and arbitrarily deprives him of the benefit of the laws of probability upon which his enterprise is necessarily founded and without which it cannot succeed over any substantial period."

The court further said (230 F.2d at 776):

* * * [W]e think that it is perhaps conceivable that Congress could, in its discretion, deny to a professional gambler the right to deduct from his total net winnings on winning races the total of his net losses on losing races in calculating the amount of his gross income. But we believe that Congress is without power to deny the professional gambler the right to offset his winnings on each race with his losses in that same race before coming to a "gain" of the type which constitutes gross income under § 22 of the Code. In other words, the appropriate unit for calculating his "gains" under § 22 may or may not be the net result over the yearly operation, but in any event it cannot be a unit which encompasses anything less than the total of his net profits (winning bets less losing bets) on every race.

The court's decision in *Winkler*, to the effect that the question of whether a professional gambler derives taxable income from his business depends upon whether the total of his net winnings on individual bets exceeds the total of his net losses on other individual bets, is not really helpful to the plaintiffs in this case. The plaintiffs admit that they are not engaged in the business of dealing or trading in securities. In other words, the plaintiffs are "casual" investors in securities. Accordingly, the *Winkler* court would say that there was no constitutional inhibition against requiring the plaintiffs to report their total income from securities during a particular year as part of gross income, while permitting them to include their total securities expense during the year among their deductions from gross income.

As the plaintiffs' total securities expense for each of the years involved here, when added to other deductions, caused the plaintiffs' adjusted itemized deductions for the year to exceed 60 percent of the plaintiffs' adjusted gross income for the year, this court does not perceive any constitutional objection to the action of the IRS in applying the minimum tax to the excess deductions.

The plaintiffs' other contentions are subsidiary to their main argument, previously discussed.

It necessarily follows that the plaintiffs are not entitled to recover in the present case.

### Conclusion

For the reasons previously stated, the court concludes, on the basis of the materi-

al submitted by the parties, that there is no genuine issue in this case as to any material fact, that the plaintiffs are not entitled to recover, and that the defendant is entitled to a judgment as a matter of law.

Accordingly, the defendant's motion for summary judgment is granted, and the plaintiffs' cross-motion for summary judgment is denied.

The clerk will dismiss the complaint. IT IS SO ORDERED.