AUGUST AND LILLIAN STEVENS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4363–70. Filed August 23, 1971.

*Theodore Berger* and *Gerald Brown*, for the petitioners.
*James F. Hanley, Jr.*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $28,310.18 in petitioners' income tax for the calendar year 1966. The sole issue before us is whether petitioner Lillian Stevens' 1966 Irish Hospitals' Sweepstakes winnings constitute wagering income within the meaning of section 1302(b)(3)[1] and are therefore excludable from the benefits of income averaging provided by section 1301.

### FINDINGS OF FACT

Petitioners, husband and wife, had their legal residence in Chicago, Ill., at the time the petition herein was filed. They filed a joint Federal income tax return for the taxable year 1966 with the district director of internal revenue, Chicago, Ill. All references to petitioner hereinafter are deemed to refer to Mrs. Stevens.

Petitioner is a hostess in a restaurant located in a downtown Chicago office building. During 1966, she purchased two tickets for the Irish Hospitals' Sweepstakes from a coemployee for $6.

The Irish Hospitals' Sweepstakes is held under the Public Hospitals Acts of Ireland, 1933–1940. Twenty-five percent of the proceeds from the sale of tickets is applied to the Hospitals' Fund and the balance, less certain authorized expenses of running the Sweepstakes, is divided into as many prize fund units of £120,000 as the sum admits. Any remainder is divided into 50 equal residual prizes. A drawing is held in which the holders of the drawn tickets receive either cash or the name of a horse which is to run in a specific race, in this case "The Cambridgeshire," which was run at Newmarket, England. The prizes for every £120,000 unit are distributed as follows: Winning horse, £50,000; second horse, £20,000; third horse, £10,000. Drawers of other horses divide £30,000. In addition, 100 cash prizes of £100 each are awarded. Under the terms of the Sweepstakes, the placing of horses (deciding the order of finish) was to be conclusively determined by

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the year in issue, unless otherwise noted.

the "Rules of the Appropriate Authority governing *wagers*." (Emphasis added.)

One of petitioner's Sweepstakes tickets was drawn and she was assigned a horse in "The Cambridgeshire." Her horse won and petitioners reported her $139,555 winnings on their 1966 return. They computed their tax liability for 1966 using the income averaging provisions of sections 1301–1305, including the Sweepstakes winnings in "adjusted taxable income" as defined by section 1302(b).

OPINION

The sole issue for decision is whether petitioner's 1966 Irish Hospitals' Sweepstakes winnings constitute wagering income within the meaning of section 1302(b)(3).[2] Petitioners do not dispute that an affirmative answer to this question will make their 1966 income ineligible for the benefits of income averaging.

The income-averaging provisions, in effect during the year in issue, came into existence with passage of the Revenue Act of 1964 (Pub. L. 88–272). Prior to that Act, there was no provision making income averaging generally available to persons whose income fluctuated widely from year to year. Instead, prior law contained an averaging provision limited to special types of situations. H. Rept. No. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2), 125, 233; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 505, 643–644.

Although the new averaging provisions were to have a broader application, Congress provided that several classes of income, one being net gains from wagering transactions, would be ineligible for the benefits accorded thereby. The explanation given in the committee reports indicates that this was done to prevent such income from receiving a preferred status. H. Rept. No. 749, supra at 236; S. Rept. No. 830, supra at 646. The term "wagering transactions" is not delineated either in the statute or the committee reports, but there is evidence that Congress had in mind the same type of transactions as are mentioned in section 165(d)[3] dealing with the deduction for wagering losses. H. Rept. No. 749, supra at 418. See also sec. 1.1302–2(d), Income Tax Regs.

---

[2] SEC. 1302. DEFINITION OF AVERAGABLE INCOME: RELATED DEFINITIONS.

(b) ADJUSTED TAXABLE INCOME.—For purposes of this part, the term "adjusted taxable income" means the taxable income for the computation year, decreased by the sum of the following amounts:

\* \* \* \* \* \* \*

(3) WAGERING INCOME.—The amount (if any) by which the gains from wagering transactions for the computation year exceed the losses from such transactions.

[3] SEC. 165. LOSSES.

(d) WAGERING LOSSES.—Losses from wagering transactions shall be allowed only to the extent of the gains from such transactions.

Section 165(d) first appeared as section 23(g) of the Revenue Act of 1934. The legislative history of that Act indicates that Congress used the words "wagering transactions" to connote gambling:

Existing law does not limit the deduction of losses from gambling transactions where such transactions are legal. Under the interpretation of the courts, illegal gambling losses can only be taken to the extent of the gains on such transactions. A similar limitation on losses from legalized gambling is provided for in the bill. * * * [H. Rept. No. 704, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2), 554, 570; S. Rept. No. 558, 73d Cong., 2d Sess. (1934), 1939–1 C.B. (Part 2), 586, 605, is to the same effect.]

The foregoing makes it clear that, insofar as the taxable year involved herein is concerned,[4] the benefits of averaging are denied to gains from gambling. We are satisfied that the Irish Sweepstakes is a form of gambling encompassed with the phrase "wagering transactions" used in section 1302(b)(3). The decided cases under section 165(d) and the reference to that section in the legislative history of the 1964 provision confirm this conclusion. Cf. *Herman Drews*, 25 T.C. 1354 (1956); *Christian H. Drodge*, 35 B.T.A. 829 (1937). See also *Skeeles* v. *United States*, 95 F. Supp. 242 (Ct. Cl. 1951); *Harry J. Riebe*, 41 B.T.A. 935, 938 (1940), affirmed per curiam 124 F. 2d 399 (C.A. 6, 1941).

Petitioners suggest that, because Mrs. Stevens was not an habitual gambler, the exclusionary provision ought not be applied to her. Any such distinction, in determining whether gambling is involved, must be rejected. See *Roy T. Offutt*, 16 T.C. 1214, 1215 (1951). Petitioners further claim that Mrs. Stevens was charitably motivated in favor of the Irish hospitals when she bought her tickets and that this alleged motivation imparts a patina to the transaction which avoids the applicability of section 1302(b)(3). We find no need to decide whether petitioner was so motivated because it is clear, at least under the circumstances of this case, that any such claim is irrelevant. Cf. *Douglas Goldman*, 46 T.C. 136, 139 (1966), affd. 388 F. 2d 476, 479–480 (C.A. 6, 1967).

Finally, petitioners argue that the transaction herein does not satisfy the condition that a wager must involve a mutual risk with respect to the happening of an uncertain event. They assert that the Irish Hospitals took no risk because they got the same amount, regardless

---

[4] In the Tax Reform Act of 1969, Congress further amended the income-averaging provisions to eliminate the exclusion of wagering income, thereby extending the benefits of averaging to such income, but the amendment was made effective only with respect to computation years beginning after Dec. 31, 1969. Pub. L. 91–172, secs. 311 (b) and (e). For the legislative history relating to the elimination of the exclusion in the House bill, its retention by the Senate, and the adoption of the House position by the conference committee, see H. Rept. No. 91–413 (Part 1), 91st Cong., 1st Sess. (1969), 1969–3 C.B. 200, 252–254; S. Rept. No. 91–552, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 423, 499, 500; Conf. Rept. No. 91–702, 91st Cong., 1st Sess. (1969), 1969–3 C.B. 644, 659.

of who won the prizes. Mrs. Stevens took no risk, so the argument goes, because she made a charitable contribution. We think petitioners' concept of mutual risk is much too narrow. When one buys a Sweepstakes ticket, he is in fact betting against other ticketholders that his will be drawn so that he will receive a cash prize or be assigned a horse. He further bets with them that if he is assigned a horse, that horse will win; under any circumstances he will win a cash prize, only the amount thereof being dependent upon the outcome of the race. As far as mutual risk is involved, the Sweepstakes is quite similar to the usual pari-mutuel operation utilized at American racetracks. Under the parimutuel scheme, there is a pool of bettors' money, a "take" off the top by the party running the operation, and a redistribution of the balance to the winners. The fact that, in the Sweepstakes, charitable organizations, i.e., Irish Hospitals, obtain the "take" is of no consequence.[5] As we indicated earlier, the extent to which Mrs. Stevens' motives in buying the Sweepstakes tickets were charitable is irrelevant.

*Decision will be entered for the respondent.*

---

[5] We note that no deduction for a charitable contribution can be involved, if for no other reason than that Irish hospitals are not qualified charities under section 170.