ALBERT R. OLSON and ROSEMARY V. OLSON, DECEASED, ALBERT R. OLSON, SURVIVING SPOUSE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Olson v. Commissioner
Docket Nos. 4530-79, 9238-79.
United States Tax Court
T.C. Memo 1982-390; 1982 Tax Ct. Memo LEXIS 357; 44 T.C.M. (CCH) 431; T.C.M. (RIA) 82390; July 13, 1982. Lionel A. Rodgers, Jr., for the petitioners. William E. Bonano, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1971, 1972, 1973, and 1975 in the amounts of $13,530, $14,855, $20,500, and $5,860, respectively. By amendment to answer, respondent claimed an increased deficiency for the year 1973, making the total deficiency claimed for that year $26,480. The issues for decision *358 are: (1) whether petitioners are entitled to deduct in each of the years here in issue the excess of the amounts paid by Mr. Olson, in the operation of a card room business, to shills over the amounts given back to him by the shills, as a business expense under section 162, [1] or are petitioners prohibited from deducting this excess in each year under the provisions of section 165(d) allowing deductions of wagering losses only to the extent of wagering income; and (2) whether petitioners have established the amounts, if any, expended by shills, from the amounts advanced to them by Mr. Olson's card room business, for food, drink, and cigarettes, and if the amounts have been established, should the gross income reported by petitioners from the food, drink, and cigarette operations be reduced by such amounts. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Albert R. Olson (petitioner) and his wife, Rosemary V. Olson, now deceased, filed joint Federal income tax returns for the calendar *359 years 1971, 1972, 1973, and 1975. Albert R. Olson resided in Walnut Creek, California, at the time the petitions in this case were filed. During the years 1971 through 1975, petitioner operated as a sole proprietor a card room known as the Vegas Club Room (sometimes hereinafter referred to as "the Club"). The Club was located in Emeryville, California, and operated a card room with tables available to patrons to play Draw Lo-Ball and Pan. During the years 1971 through 1973, the hours of operation of the Club were 10:00 a.m. to 2:00 a.m. and in 1975 the Club was opened for these hours on weekdays and 24 hours a day on weekends. The Club was licensed to operate five tables. The Club paid a license fee to the City of Emeryville with respect to the conduct of the card room business and such business was legal in all respects. The game of Draw Lo-Ball is a gambling activity and is a form or variety of Draw Poker. The game of Pan is a gambling activity and is a form or variety of Rummy. In Draw Lo-Ball each player receives 5 cards face down and each player may, at his option, discard up to 3 cards and receive an equal number of replacement cards from the deck. Bets are made *360 by the players at intervals and, consistent with the established values in Poker, the lowest value wins. In Pan, each player is dealt 10 cards from 8 decks which are used. At intervals, the players can draw replacement cards from the deck. The first player to acquire certain predetermined combinations, similar to those in Rummy, is the winner. In order for a patron of the Club to play at the Draw Lo-Ball or Pan tables, he pays a rental, or seat, charge to the Club determined with respect to the stakes of the game. The hourly rate depends upon the established minimum or maximum bet for the particular game or series of games. The rental, or seat, charge in petitioner's club ranged from approximately $1 to $5 per hour with respect to Draw Lo-Ball and per game with respect to Pan. The income of the Club is made from seat rentals and the Club does not bet against players. Rather, the players put up the minimum or maximum bet or an amount in between as in any game and the winner wins the pot. Since the income of the Club is made from seat rentals, it is important to have a game going at all times the Club is open for customers to join in and play. For this reason, it is important, *361 common, and customary to the card room business as conducted by the Club that patrons who desire to play Draw Lo-Ball or Pan find an open game to play. In order to have a sufficient or satisfactory number of players to start a game or to keep a game going, the Club engaged shills. A shill is an individual who plays in the Draw Lo-Ball or Pan game at the request of the Club. In connection with the card room business conducted by the Club, shills were engaged with considerable frequency and the activity contributed significantly to the income producing activities of the Club. It was common and customary in the business of operating card rooms to engage shills in the manner in which they were engaged by the Club in this case. The Club engaged shills under an arrangement known as a "stake" whereby the Club would give or advance a certain sum of money or, in some instances, money's worth in chips to the shill to play in Draw Lo-Ball or Pan for a period of time. At the end of the period of play of the shill, he would account to the Club in accordance with an agreed arrangement. The agreement was that if the shill had less in money or money's worth in chips than the Club had advanced *362 to him for the purposes of commencing play, he would return the amount he had remaining to the Club. If he had none of the original amount advanced to him by the Club remaining at the end of his play, no amount would be returned to the Club by the shill. If the shill had more money or money's worth in chips at the end of his period of play than was originally advanced to him, he would return to the Club the amount originally advanced to him plus one-half of any amount over and above the amount originally advanced to him. The shill was entitled to retain the remaining one-half as his own. Shills received no other money from the Club and they were not treated as Club employees for any purpose. A shill placed bets at the tables in the same manner as any other player. When a customer, other than a shill, wanted a place at a table, a shill was required to release his place. Generally, 8 players played at a table. The Club considered it necessary to have at least 6 players at each table and preferably 7 players in order to keep an adequate game going. If 7 customers other than shills were available, no shills would play at a table. If petitioner had more persons come to the Club seeking *363 to act as shills than he needed to fill the tables, he would select the persons he considered the most competent players. During the years in issue in this case, the Club also engaged some shills under an arrangement known as "cow." Under the "cow" arrangement, the Club would advance to the shill one-half the amount needed by the shill to play Draw Lo-Ball or Pan. The shill would make up the remaining half from his own funds. At the end of the period of play, if the shill had less money or money's worth in chips than the amount he had at the beginning of the period of play, the shill would return one-half of such amount to the Club. If at the end of a period of play the shill had more money or money's worth in chips than the amount he had at the beginning of the period of play, the shill would return one-half of such amount to the Club. If the shill had no money or money's worth in chips at the end of a period of play, no amount would be returned by the shill to the Club. Shills were required to pay seat rentals, as were all players, and shills paid the seat rentals from amounts advanced by the Club. The Club maintained an accounting record on a daily basis of the amount advanced *364 to the shills and the amount the shills returned. The following schedule shows for the years here in issue the net amounts received by shills after deducting from the amounts advanced to them the amounts returned by the shills to the Club: Year
Amount
1971
$29,073.05
1972
39,080.45
1973
50,947.75
1975
18,381.00
Although for each of the years here in issue the shills collectively returned less money or money's worth in chips to the Club than the amount originally advanced to them, on a daily basis shills sometimes ended a period of play with more money or money's worth in chips than the amount originally advanced to them by the Club. During the years 1971, 1972, and 1973, the amounts of table rental paid by shills was included in the Club's gross income. However, during 1975, the table rental paid by shills was not included in the Club's gross income. During the years 1971, 1972, and 1973, 18 percent of the Club's total seat rentals was made up of amounts paid by shills with money advanced to them by the Club for them to play in the Draw Lo-Ball and Pan games. During the years 1972, 1973, and 1975, petitioner operated in conjunction with the Club a room *365 which sold coffee, soft drinks, and mixed drinks and, at times, food such as soup and sandwiches. This operation was shown on petitioner's records and the income from the operation reported on a Schedule C attached to the return for each of these years under the name "Vegas Room." The Vegas Room operated to prepare and sell food and beverage items to Club patrons and shills for normal and customary prices. During the years 1971, 1972, 1973, and 1975, petitioner operated in conjunction with the Club an operation known as "Arro Sales" and reported the total gross income from this operation on a Schedule C attached to each year's return under that name. Arro Sales operated to sell cigarettes under that name. Arro Sales operated to sell cigarettes to Club patrons and shills for normal and customary prices. Shills were required to pay for food, beverages, and cigarettes as were all other players. Although the funds advanced to shills by the Club were advanced to them for the purpose of playing at the tables, petitioner or a card room floor man of the Club would at times see a shill spend funds for coffee, soup or a sandwich which he believed came from funds advanced to him by the *366 Club. If petitioner or a card room floor man saw a shill spending funds he believed had been advanced to him by the Club for coffee or a sandwich, he would not question him, but if he saw a shill spending more than he thought he should spend for beverage or food out of money he believed had been advanced to him by the Club, he would probably ask the shill not to spend funds in this manner. Neither petitioner nor a card room floor man discussed the purchasing of coffee or food with a shill. However, petitioner was of the opinion that shills bought coffee and, occasionally, a sandwich out of money advanced to them by the Club. A shill was not required to account for any money he brought into the Club with him, and petitioner had no way of absolutely knowing whether a shill paid for coffee or food from funds he brought into the Club with him, winnings he may have had, or money advanced to him by the Club. Petitioner and card room floor men did, however, observe shills buying coffee and cigarettes, and at times soup or sandwiches, with chips while they were playing at the card tables. During each of the years here in issue, amounts paid by shills for food, drinks, and cigarettes, regardless *367 of the source of the funds with which the payment was made, were included in petitioner's gross income reported on the Schedules C under the names "Vegas Room" or "Arro Sales" attached to petitioner's return. Mr. Olson was at the Club every day that it was open for a period of 8 to 16 hours. However, he spent a part of this time in the Club office. At all times, however, there was someone on the floor of the Club to see that the games were properly played. Not all of the shills would buy food or drinks on any one day, although on every day some of them would buy food and drinks. The following schedule shows the seat rental income reported by petitioner on Schedule C for the Club under the name "Vegas Club Room" for each of the years 1971, 1972, 1973, and 1975: Year
Seat Rental Income
1971
$113,352.00
1972
142,160.00
1973
163,340.45
1975
147,499.00
The following schedule shows the gross income reported from petitioner's operation of sale of food and beverages under the name "Vegas Room" on a separate Schedule C for each of the years 1972, 1973, and 1975: Year
Gross Income
1972
$50,489
1973
77,687
1975
86,924
The following schedule *368 shows the gross income reported by petitioner for each of the years 1971, 1972, 1973, and 1975 from the operation known as "Arro Sales" on a separate Schedule C attached to his return: Year
Gross Income
1971
$4,838
1972
8,650
1973
11,217
1975
12,733
For the year 1971, petitioner deducted on Schedule C for the Club as promotion expense the amount of $59,746. This amount represented the gross amount advanced to shills by the Club in 1971 prior to reduction for the $30,635.20 returned by shills to the Club during that year. The amount returned by the shills to the Club in 1971 was added to gross receipts of the Club in that year. The net effect of this reporting method was to take a deduction as promotional expense of $29,073.05. For the year 1972, petitioner deducted on the Schedule C with respect to the Club as promotional expense the amount of $39,080.45, representing the amount advanced to shills in excess of the amounts returned by the shills to the Club. For the year 1973, no amount is shown on the Schedule C of the Club as a deduction for promotional expense. However, the gross receipts shown on the Schedule C for the year 1973 of $142,963.12 was *369 arrived at by reducing total gross receipts by $50,947.75, which was the excess of the amounts paid by the Club to shills during 1973 over the amounts returned to the Club by shills in that year. For the calendar year 1975, petitioner deducted on the Schedule C for the Club a promotional expense of $18,381, which is the excess of the amount paid to shills by the Club in that year over the amount returned by shills to the Club less the seat rentals paid by shills. No amount was deducted by petitioners on their 1971, 1972, and 1973 tax returns, nor was gross income reported on their returns reduced by the amounts paid by shills for seats. No reduction of gross income of the Vegas Room food and beverage operation for the years 1972, 1973, and 1975, or the Arro Sales cigarette operation for the years 1971, 1972, 1973, and 1975 was made for purchases of items by shills. Respondent in his notice of deficiency disallowed the deductions taken by petitioners in each of the years here in issue for the excess over amounts advanced by the Club to shills and the amounts returned by shills to the Club. The parties have now agreed that an excessive amount was disallowed in 1971 because of the *370 manner in which petitioner took the deduction for promotional expense in that year. For the year 1973, respondent only disallowed $39,000 of the deduction claimed on account of payments to shills. In his amendment to answer, he alleged that this amount should properly be $50,947.75. On brief, respondent conceded that petitioner's gross income for the years 1971, 1972, and 1973 should be reduced by the amounts of $20,403.26, $25,589, and $29,401, respectively, representing seat rental income paid by shills to petitioner's card room business, and that for the year 1975 petitioner's gross income as reported should not be increased by the amount of table rentals paid by shills. Petitioners, in various amendments to their petitions, claimed that they should be entitled to deductions or their reported gross income reduced in the years 1972, 1973, and 1975 for food, beverages, and cigarettes purchased by shills in the amounts of $34,682, $35,450, and $37,346, respectively. Petitioners claimed that for the year 1971 their gross income as reported from Arro Sales should be reduced by $2,032 for cigarettes purchased by shills. OPINION The primary issue in this case is whether the *371 amounts paid by the Club to shills in excess of the amounts returned by the shills to the Club are deductible ordinary and necessary business expenses under section 162 or are amounts which constituted wagering losses which are deductible under section 165(d) only to the extent of wagering gain. Under the facts here, no deductions are allowable under section 165(d) since, in arriving at the deduction claimed from payment to shills, petitioner reduced the total amount advanced to shills by the amounts received back from them. Petitioner's income from table rentals in the card room did not include any wagering gains. An appeal in this case would lie to the Court of Appeals for the Ninth Circuit. In the case of Nitzberg v. Commissioner,580 F.2d 357 (9th Cir. 1978), revg. a Memorandum Opinion of this Court, [2] the Circuit Court stated (at 358): *372 Under the facts of this case, the payment of shills is an "ordinary and necessary" business expense and would be deductible, absent the wagering provisions of 26 U.S.C. sec. 165(d). But the losses generated here were "losses from wagering transactions." Each time the shill made a bet, he was wagering, and since he was using the Club's money under an agreement to pay the Club 50%, the Club was wagering. However the relationship of the shill to the Club may be characterized, the shill, in placing a bet, was acting for the Club. It is urged that, as to the Club, the transactions were not wagering transactions and that the Club, by reason of the odds, was sure to lose. In any one game the shill might win, and in any one night, totaling all wins and losses, the shill might win more than twice what he lost. The fact that at some time the odds involved in a game of chance are bound to assert themselves does not convert a wager into something else.* * * The losses here are described, therefore, under both sections of the code, and the question is--which section applies? 26 U.S.C. sec. 162(a) deals with a wide variety of businesses while *373 26 U.S.C. sec. 165(d) deals specifically with gambling losses. The general rule is that a specific statute controls a general one. United States v. Bates,429 F.2d 557, 559 (9th Cir. 1970). This rule has been applied to the business expense--wagering loss problem. In Skeeles v. United States,95 F.Supp. 242, 247, 118 Ct.Cl. 362, cert. denied,341 U.S. 948, 71 S.Ct. 1014, 95 L.Ed. 1371 (1951), it was said: "This is also the result reached by application of the customary rules of statutory construction. * * *" We find no distinction in the facts as set forth in Nitzberg v. Commissioner,supra, and the instant case which is helpful to petitioner. Here the agreements with most of the shills were identical to that in the Nitzberg case. Apparently, in the Nitzberg case there were no agreements comparable to petitioner's "cow" agreements.However, the two agreements are not distinguishable in principle since both involved an advancement of funds by the Club to the shill with a share in the winnings coming back to the Club if the shill won. Petitioner attempts to distinguish the Nitzberg *374 case because in that case this Court had found that shills "were instructed by the club to play conservatively." Petitioner argues that there is no showing in the instant case that shills were instructed to play conservatively. In our view, the fact that the record in the Nitzberg case shows that shills were instructed to play conservatively, and this fact is not affirmatively shown in this record, does not distinguish the Nitzberg case from the instant case. The Ninth Circuit in its opinion made no reference to the fact found by this Court in a fully stipulated case that shills "were instructed by the club to play conservatively." We conclude that there is no distinction in the instant case and in the Nitzberg case. Therefore, in accordance with Golsen v. Commissioner,54 T.C. 742 (1970), affd. on other grounds 445 F.2d 985 (10th Cir. 1971), we hold that the excess of the amounts paid to shills over the amounts returned to the Club by shills are not deductible by petitioners as ordinary and necessary business expenses under section 162 but constitute wagering losses deductible only to the extent of wagering gains under section 165(d). *375 Much of the testimony in this case dealt with how much, if any, of the money furnished to shills by the Club was spent by the shills on beverages, food, and cigarettes. The record is not clear during how much of the period involved in this case food was served by the Club. Clearly, beverages, including coffee, soft drinks, and other drinks, were served by the Club during the years 1972, 1973, and 1975, and cigarettes were sold during all of the years here in issue. Most of the sales of the Vegas Room were to players in the card room.Petitioner and two employees of the card room who supervised card games testified with respect to the frequency with which shills would buy food and drinks. It is clear from the testimony of all three of these witnesses that they were not carefully observing the shills' purchases of drinks and food and could not state absolutely of their own knowledge whether drinks and food were purchased by shills from money advanced to them by the Club, from their winnings, or from money they brought into the Club with them. It is certainly clear from this record that the amounts claimed by petitioner to represent the purchases made by shills is incorrect. When the *376 amounts which petitioner claims were spent by shills for food, drinks, and cigarettes are added to the amounts of seat rentals paid by shills in each of the years 1972 and 1973, the result is over $60,000 and $64,000, respectively. If these amounts are compared to the amounts of approximately $39,000 and $51,000 in these respective years of the net advances to shills before reduction for seat rentals paid by shills, it is obvious that the amounts petitioner claims to have been paid out of funds furnished to shills by the Club for food and drinks are not correct. This incorrectness is equally noticeable in 1975. In that year petitioner deducted $18,381 as the net amount paid to shills less seat rentals paid by shills. Petitioner contends the shills spent $37,346 in 1975 on drinks, food, and cigarettes from funds advanced to them by the Club. If the shills had spent the amounts petitioner claimed they did on food, drinks, and cigarettes, they would have had no funds from the Club with which to play at the tables. The purpose for the advance of funds was to enable the shills to play in the card games. On the basis of this record, we conclude that petitioner has failed to show the *377 amount, if any, which the shills expended from sums furnished to them by the Club for food, beverages, and cigarettes. We therefore conclude that petitioner has failed to establish that any adjustment should be made to the gross income reported on the Schedules C of the Vegas Room and Arro Sales because of any sums shills may have spent for food, drinks, and cigarettes in the years here in issue. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
2. In our memorandum opinion in Nitzberg v. Commissioner,T.C. Memo. 1975-154, and the supplemental memorandum opinion T.C. Memo. 1975-228, reversed Nitzberg v. Commissioner,580 F.2d 357 (9th Cir. 1978), we held that the net payments to shills were not wagering losses but were ordinary and necessary business expenses under sec. 162(a). In the instant case the record is clear that the expense was both ordinary and necessary. The record shows tthat the practice of employing shills was engaged in by all clubs operating tables for Draw Lo-Ball and Pan and that it was necessary to employ shills to keep the tables open for business. Therefore, if we were to follow our holding in Nitzberg v. Commissioner,supra, rather than that of the Ninth Circuit Court of Appeals, it would follow in the instant case that the net amounts paid would be deductible. However, the Ninth Circuit, in stating that our decision was reversed, specifically held that the excess amounts paid to shills over the amounts returned by them to the Club were wagering losses deductible only to the extent allowed under sec. 165(d)↩.